Good morning, Counsel. May it please the Court. My name is Carl Rupp. I represent the defendant below, an appellant herein, Datatreasury Corporation, or DTC, as the Court will hear my client refer to throughout this argument. The first question for this Court's consideration is whether it was appropriate to give retroactive application to the most favored licensee clause in a patent license agreement between DTC and JPMC Bank. DTC maintains that it was not appropriate to do so because the language of the MFL clause was exclusively prospective, not retroactive, and because all previous case law from every jurisdiction to have considered the issue, including the Fifth Circuit opinion in Rothstein v. Atlanta Paper Company, holds that it is impermissible to read into a patent license agreement any right to a refund of previously paid royalties unless the language of the most favored licensee clause expressly provides for such refunds. The question before the Court is primarily one of contract interpretation, and the touchstone for any question of contract interpretation is, of course, the language of the contract itself. You found a case where you're comparing lump sum to lump sum license fees? What is clear from the landscape of all the previous jurisprudence, Your Honor, is that the flavor of royalty structures covered in the previous cases is all across the map. There are cases going from lump sum to running royalty, from running royalty to lump sum, and the variants are infinite. What is consistent across that panorama of the case law is the language of the most favored licensee clause is specific in its provision for a refund, then no refund will be ordered by the Court. Have you found a case comparing lump sum to lump sum? No, Your Honor. We have not found any case wherein a Court previously considered whether there was some distinction going from a lump sum to a lump sum to the general rule. And the best proposition, the best support for the last proposition, that if in absence of language as to refunds, the default rule is prospective only, what's your best authority for that? Your Honor, there— Rothstein said it, but it was highly specific to the language in the case. And it had a running royalty, too. That's exactly right, Your Honor. And there are cases that compile the previous jurisprudence and indicate that the case law—for instance, I would cite to the Court for that proposition Cadillac v. Triendo, which is cited in the JPMC red response brief at pages 43 to 44, wherein the Court said, quote, Cadillac was not entitled to credit on a paid-up license based on royalties it already paid. This much is supported by case law, and then went on to collect the cases that it previously held that no right to refunds existed, barring specific language in the most favored licensee clause. Does this equate to an ironclad rule that there must be language in the MFL license clause to the effect that a refund is provided? I'd leave that to the Court to decide. What I would say is that the decisions are uniform in finding that on language substantially equivalent, if not identical, to the language of the MFL clause in the case at bar, the ruling has always been consistent, which is no refunds. But does it make a big difference whether you're comparing a lump sum to a lump sum as opposed to a lump sum to a running royalty? I mean, you know, it's clear if you've got a running royalty and you pay so much a unit, at the end of the month you pay that royalty, and that royalty is earned, and there's no way that you're going to get that money back. But here they paid substantial money for an unlimited term and unlimited usage. And that's exactly what the second license agreement provided for. You agree with that? I'd make two points in response, Your Honor. I don't agree. And the reason why is that this isn't a true, number one, this isn't, and the Court should not view it as a true lump sum agreement. This was a periodic royalty agreement wherein the payments were made over the course of not just a few days or a few weeks, but seven years to cover the infringement that would have otherwise been occurring during that time frame and to wipe out the past infringement that existed as of the time of the lawsuit. Well, I find it a better interpretation of that settlement agreement to say it was a lump sum and the lump sum was just paid in installments. One could view it that way, but that... Wasn't the full amount due at the time of the settlement? Wasn't that, I mean, couldn't they have, if you had missed a payment, couldn't they have sued for the full amount? I believe that the remedy provided for, and I'd have to double check the terms of the patent license agreement, but I believe that the remedy provided for by the patent license agreement for untimely payment of any given installment of the periodic royalty payments was an elimination of the license rather than some type of acceleration of all amounts due. And I cannot swear to that, Your Honor, but I believe that to be the case based on the terms of the license agreement. I'm going to throw three quick questions. You can respond to them at any point or as you hear. When you say part of the agreement here was also to wipe out past possible infringement — in other words, the amount paid by J.P. Morgan included a release provision — likewise CAFE, but I haven't seen that you've argued, therefore, the price terms aren't identical, there's no equivalency in as much as the $70 million may have been in large part because of the release provision, and therefore, the language of, you get the most favored term as it relates to the license, would be apples and oranges. But that isn't something that I've seen you press here. And the reason, Your Honor, is that because both the licenses included a release for previous infringement, the only connection to the argument at bar is that it feeds into the second issue, which is whether or not Data Treasury was improperly precluded from arguing that the per-transaction pricing for CAFE Bank was not better than the per-transaction pricing for JPMC. We would have to factor into that the past infringement release for CAFE Bank as well as the past infringement release for JPMC. Just the two other quick concerns. Even if your theory's right, that it was perspective only, am I right that it would be prospective as of the first next license that was negotiated? So had you given them notification, about a year later was your first license to the next licensee? The choice was JPMC's to make as to which, allegedly, more favorable. They couldn't make a choice if you didn't notify them. That's correct. But they made their choice, Your Honor, on the basis of the CAFE Bank at a time when they already knew of 31 other licenses that were for less than $70 million. Tell me this. Let's say this second license agreement had been entered into a week after this license agreement was entered into. Would J.P. Morgan have no recourse? Oh, no, certainly. Let me make sure that I understand Your Honor's question correctly. The question is whether or not if JPMC and DTC entered their license agreement and then a week later there's an agreement with DTC and some third-party licensee for a price term that JPMC viewed as more favorable, would JPMC be out of luck? Absolutely not, Your Honor, and that is precisely the point. JPMC claims that they have lost the benefit of the MFL clause by virtue of the interpretation we propose and by virtue of the interpretation that the case law demands. That is not the case. JPMC was entitled to full price protection during the time period that it owed royalties to Data Treasury. So in Your Honor's hypothetical, it certainly would have owed a substantial additional ongoing royalty at that point in time. But once seven years down the road, after JPMC had enjoyed the benefits of the license agreement and the burdens by making its royalty payments and the last payment had been made in May of 2012, from that point forward, JPMC enjoyed a royalty-free license to the DTC patents. And because at that point in time the license became a royalty-free license, there were no better terms that could be afforded by DTC to some third party absent DTC offering to pay someone for the use of its technology, which of course would never happen. But they had protection during a certain period of time. They only had protection until the last payment was made under the Most Favored Nation Clause. That's correct, Your Honor, and because... The contract doesn't say that, you know. Well, no, it doesn't, but it is inherent in the language that the parties chose, and it also is an inherent result of the royalty structure that JPMC preferred. Instead of electing a running royalty structure, JPMC preferred a periodic payment of royalties elapsing seven years from entry of the license agreement. That carried... This case drove me to the treatises, and it just seems to me that, well, this guy, Drattler, who wrote the treatise, talks about how indeterminate lump-sum agreements are problematic, and the drafter has to be very careful. And they say one way you can protect yourself is to limit the term of the license agreement. Put a provision in the... You know, like here, you could say in this agreement, the Most Favored Nation Clause has no effect after 2012, but the contract doesn't say that. As this treatise suggests, that clause was not inserted. But I would suggest, Your Honor, that on the basis of the case law, which was an example at the time of entry of this license agreement, another way that one, if one were representing JPMC, could protect oneself would be to write in what the case law demands, which is an express provision for refunds in the event of a lower price being afforded at a point in time when the royalties had already been completed. Well, if we had some case law comparing apples to apples, lump-sum to lump-sum, that would be clear to me that that's required. Let me turn to that point, Your Honor, because I know that's come up a couple of times. The question of whether or not this case is different from all the previous cases, because the more favorable price term that JPMC sought was a lump-sum agreement rather than a different running royalty rate, is a distinction without meaning. And the reason that I say that, Your Honor, is that these cases are not grounded on the particular flavor of the royalty rate, but rather they're grounded on the underlying policies and reasons for an MFL clause, namely, to protect the competitive position of an early licensee vis-a-vis later licensees. But JPMC's interpretation and the question that the Court raises of whether or not there's some meaningful difference with respect to lump-sum agreements does not in any way further the underlying purpose that supports the existence of MFL clauses. Well, to me, that just points out why the drafter needs to be very careful. And I would submit, Your Honor, that on the basis of the language here, the drafters were careful. They used only prospective language. The MFL clause sets out an if-then type of proposition. Specifically, the language says, if DTC grants to any other person a license, they will be entitled to the benefit of any and all more favorable terms with respect to such licensed patents. The language that was drafted carefully is exclusively forward-looking. If one circumstance comes to pass, then another result will follow. And the forward-looking nature of the MFL clause is solidified by the last sentence, which says that the MFN shall be applied within 30 dates from the date this provision is recognized in accordance with Section 10.7. Again, exclusively forward-looking language. Well, all I can say, the treatises seem to think that it's a real problem that needs to be handled in the contract. I don't disagree, Your Honor. It is a real problem, and that's what leads to us standing here before the Court today. However, we submit that that problem is answered by the language of the contract and that that language, because it's only prospective and doesn't provide for refunds, should have been honored below. My difficulty with that, though, is that the language, therefore, and their getting what they bargained for, was crucially dependent on you notifying them of the very next license. And it's undisputed on this record you didn't. So, factually, they're caught. Your Honor. You're saying they're protected up until their last payment. Their election was for a — and the reasons why JPMC elected the Cathay license as their most — as their preferred — Well, that may be a strategic call that's the waiver issue, but way back when they negotiated with the first one a year later, NC Corp. If you'd notified them, they could have taken advantage of the rule you're urging. They certainly could have, Your Honor, but they also probably elect — I would speculate that they elected the Cathay license because they wanted to avoid some very difficult and thorny notice issues to them on the basis of their counsel representing another entity which they were a part owner of and in which they sat on meetings. In your time running out, what's the — I mean, a lot of the district court's reasoning was not legal. It was this provision becomes meaningless. So my question to you is if we affirm, what's the downside for the larger corpus of law relating to licenses? If we were to affirm and say you do get retroactive back to the moment of inception, what's the harm done? It will strongly disincentivize any future patent holder from protecting the early licensee's rights by pursuing patent litigation because they're going to be faced with the proposition of potentially having to refund staggering amounts of money, just as was ordered here, that was not contemplated in the patent license agreement's language. That's the downside, Your Honor. The other way to handle that is in the contract, though, isn't it? Absolutely, Your Honor. And what should happen if a licensee wishes to have that protection is they should negotiate for the express refund provision that the case law calls for. I think very often in these contract cases, we ought to have a guy that drafted the contract up here already in his case. I don't disagree, Your Honor. Thank you very much.  All right. Ms. Reed. Ms. Reed. Thank you, Your Honor. May it please the Court, I'm Noelle Reed, representing J.P. Morgan in this appeal. If the Court doesn't mind, I'd like to start by addressing some of the questions that the Court has previously asked of Mr. Rupp. And, of course, I'm happy to entertain other additional questions. First, Mr. Rupp began by saying that courts have held it as impermissible to read in a refund ability into an MFN unless the clause expressly provides. There is no such holding in any case addressing an MFN that's been cited in this Court. In response to Judge Davis's question, there are no lump sum to lump sum comparison cases, and I would submit to the Court that is because the result is so obvious that it can't escape notice. You're not going to have somebody arguing that we can't get a refund when we've paid $70 million for a lump sum license and a later licensee pays $250,000 for a later license. What do you do with the language will be entitled? The language will be entitled defines when the clause is invoked, not the limits on what or how the clause will be invoked. It simply says that the right accrues when you enter into the later license, and at that point you're entitled. And it goes on to say to the benefit of such more favorable terms, not to substitution, not to supplanting, and it does not have the language that it is in virtually every other case that is cited limiting it to from and after the date of the subsequent license. That language is in Cadillac, from and after the date it is established. It is in Loney, subsequent to the date of such grant. It is expressed in Novamont. There is a sentence in the license that says there shall be no royalties. It is in Hercules, as of and after the date more favorable rates become available. It is in Amarok, with respect to royalties payable after the date of such notice. It is in Hazeltine. It is in Guggenheim. It is in Hawkerson. There is limiting language that the courts rely on, specifically in each and every one of those cases, to find that a past payment is not refundable. Is there any case that you have found that does refund back to the moment of inception, in other words pre-election moment, when there isn't even a competing licensee? Is there any case that does give refund? The closest there is to addressing that scenario is the Epic systems case.  But Epic acknowledges, in giving Epic the benefit, or giving the plaintiff the benefit of the $350,000 medical logic license, Epic also declares, the court declares, that they can also claim the benefit of the earlier Oasis license, which was $175,000. That would give you back, I mean it gets back to the notice difficulty that your client was in, but it would only get you back to NC Corp's January 26th license. There's no case that I've seen ever that would even give you refunds for the period of time where you had an exclusive license. Yes, but that assumes that in paying our initial $30 million, that what we intended, what the parties intended with this MFN language, was that on day two, after we signed, if they get $29 million, gone, and we intended to never collect it. That drove the district court's analysis, but I'm not sure that that, when we start talking about realities and policy, the logic of your rule has the opposite windfall. In other words, you get your license in 2005, and these things, these two licensees, license expire around 16 and 17. So, JP Morgan, which it seems like the record evidence says you do about, what, 5 billion check transactions a year. I don't think there's actually record evidence that shows what our actual transactions are. I think it says in 2013 you do 5 billion check images a year. So, even if you accept your own pricing for each transaction at $0.02 per transaction, you got an incredible deal for just one year of licensing. But my windfall problem is, under your logic, you negotiate a license in 2005. CAFE doesn't even appear until a few years before the expiration, but you're saying that the two price terms have to be identical? Yes. But you had how many years of uninterrupted use before CAFE enters in the picture? I mean, you have billions and billions of transactions where your license gave you what you paid for. But the difference is, what we paid for was the right to use it, and on an unlimited basis. We also took the risk from Data Treasury, by not doing a running royalty, that we would use it far less. We took the risk that we had paid this amount for this license, and the next day we'd find a better technology, and we'd have paid $70 million for nothing. But everyone knew, I mean, Data Treasury, like it or not, their whole business model is to give licenses. And the record, your expert shows they've done, what, 47, 36, 47? Correct. So it's hard to imagine they negotiated, if the intent of the parties, especially when they use future language, they negotiated that every single one of those licenses they give, they now had to give your client the identical posture of each later one, including the most recent one. It's actually not hard to imagine at all. First of all, everyone knew how to write limits into an MFM clause. And in fact, had they looked at any of the existing precedent at the time, they would have seen all of those limiting language clauses that were included in those other provisions. So they certainly knew how to do it. They also knew how to do it because they put it in other licenses. In the Wells Fargo license, which is in the record, they actually wrote, there shall be no refunds of the consideration previously paid. So they knew when they needed to limit it. And that was before we made a claim and before there was any argument about this. They knew to put it in there. Your other point goes really to Mr. Rupp's argument about the harm that is inherent in giving this refund. Data Treasury, no one should cry for Data Treasury. They leveraged our initial $70 million settlement into $600 million worth of settlements. I submit to you that had they been told at the beginning, well, we'll do the $70 million now, and a few years from now, you'll have to give back 69, but you'll have made 600, they'd have taken that deal every day of the week and twice on Sunday. And why not? It's a perfectly rational result. In addition, consider they only give the MFN to that first licensee typically. That's usually how that works. It is then entirely within their control to enter into licenses that do or do not contain more favorable terms. And it's frankly easy to structure them in a way that doesn't create this problem for them. They could have entered into running royalty rate licenses. It would be impossible to say that a running royalty was more favorable than a lump sum granted out at the outset, because why would we pay again for the use of a license when we'd already paid the lump sum amount? So it's an entirely rational bargain from both parties' point of view, protecting JP Morgan and giving Data Treasury the opportunity to use that license to drive other settlements at the potential cost of a refund that is entirely within their own control. Excellent arguments both ways. I can see rationality to each one. You've got an extraordinary per-use rate, which you've yourself put into the contract that was worth two cents a transaction. Both arguments asking us to come up with a rule have huge windfall problems. So if we just in a very narrow way look at this clause and say, well, future tense verbs, there's at ambiguity, wouldn't we get back to determining what exactly on a remand allow the parties to establish with parole evidence what was intended here? There's no evidence in the record that was submitted that would allow that determination. There's no evidence that Data Treasury intended this not to operate retroactively. But if the language looks prospective and there's no case that ever makes it fully retroactive, that's a context that sounds ambiguous. I mean, go ahead. I'm sorry. No, no, no, that was it. You do have the Amarok language that says explicitly that if you give a lump sum to one licensee and later give a lower lump sum to another licensee, you must give that lower lump sum to the first licensee. Remind me, as of, you must give it as of the first opportunity to elect or back to instead? The statement is made without reference to time. That statement is made as an absolute statement. In Amarok, it is applied to exclude the differential in time because it was a conversion case or running royalty to lump sum. And there was an express statement that the new rate would apply only as of and after the other date. I've asked you a lot of questions. Go ahead. Not at all, Your Honor. I want to go back to your $0.02 to $0.05 point. To refresh my memory, how is the settlement agreement phrased as far as whether this is a lump sum or a periodic payment? The settlement agreement makes very clear that the license is granted for the full consideration that is set forth. That's in the license. The license is granted for the full consideration set forth in the settlement agreement. And the consideration is set forth as an installment payment. It is not a periodic royalty. It is not a $3 million for the first year, $5.5 million for the second year, and you can stop. And I would like to get back to the point one of you asked a question about the potential forfeiture. $10.8 of the license states explicitly that the failure to make a payment terminates all rights and licenses under the agreement, meaning failure to make that last $7 million payment would undo the entire agreement and potentially expose J.P. Morgan to a suit for the infringement even during the license period. Did you owe the money, though? Would you owe the full amount of the contract price? As of day one, yes. The full amount was owed. And the failure to make all the payments would have forfeited the rights under the agreement. What purpose is served in the agreement by the designation of a reasonable amount, such as a certain amount per transaction? The purpose served by the designation is to allow Data Treasury to have something to point to to show J.P. Morgan agreed to this. They asked for it and put it in the drafts of the agreement. Why they wanted it, you know, I think that's the purpose. The record seems to suggest that's the purpose. They fought to put these licenses in front of juries, and they certainly made those arguments. But even — Didn't the court suggest that it might be necessary to make sure the contract was valid, huh? Didn't he suggest something like that? I mean, I don't know much about patent law, but he seemed to think there was some rational reason for having it in there. He did. But I think what he was saying was it was of value to Data Treasury to have this representation from one of the first licensees, one of the first settling parties, saying it was a reasonable rate. But, of course, when we construe a contract, we have lots of cases that say we are to give meaning to each provision. That meaning doesn't jump off the page to me when I read the contract. So I want to give it some kind of a meaning, as we normally do in contract construction, and I don't see any meaning there. I appreciate that. Its meaning was special to Data Treasury and to its ability to say that J.P. Morgan had affirmed that this would be a reasonable rate range. I want to be very clear, Judge Higginson, and go back to something that you said. J.P. Morgan made no agreement that 2 cents to 5 cents related in any way to its own $70 million payment. There's nothing in the record showing that J.P. Morgan ever looked at a per-transaction figure when it calculated its lump sum license. In fact, the record site that Data Treasury relies on saying the parties considered it says that the J.P. Morgan representative was asked for a running royalty of something like 2 cents to 5 cents and said, absolutely not, I will not negotiate anything based on a running royalty. It will be a lump sum and nothing else, and that's where the discussion went. The district court had an invited supplemental briefing, sort of, I think, on the same line of concern that I believe Judge Davis was getting at, which is these treatises acknowledge these lump sum price points can contain many components. So you heard me ask opposing counsel, why aren't these apples and oranges in as much as each of them integrate the release settlement provisions? So $70 million may have been because J.P. Morgan had some exposure to vastly more infringement concerns. So those don't relate to the future license. Those price points are just unable to compare. What's your thought on that? Most importantly, from your perspective, that argument was never made. Never urged. Okay. So having not made that argument, it's waived and the court need not consider it. Is the duration issue implicit? In other words, J.P. Morgan's got from 2005 to 2016, but Cathay just has 13 to 16, no? It's not, Your Honor, for the same reason that asset size isn't, for the same reason that any other measure that is a proxy for use wouldn't be relevant here. So the court's just really simplified. The Second Circuit said so, and that's just how we look at these lump sums. It's too difficult to break them apart into constituent elements? It's not a matter of whether it's too difficult to break them up into constituent elements. It's a matter of whether it's appropriate. The court made the point that when you have a running royalty, if you're the first licensee and you're paying $1 per widget, for the time you're buying widgets, let's say you buy 100 in your first period before there's a second licensee, you've paid $1 per widget. The new licensee gets a license for $0.50 per widget. That's very simple. But the lump sums make it really hard. But it's not really that hard because it's the unlimited opportunity. Consider the licensee who gets a lump sum license on day one, and who uses it to produce 10 widgets a year. And in year five, someone else gets a lump sum for far less and floods the market with widgets. That has effected. One year to flood, because the patent's about to expire. Wouldn't the price go up? Well, first of all, if you want to make a parallel to this case, it would be half the time. And I'll submit to you, if you'd like to render and say we have to pay $500,000 for the license rather than $250,000 for the license, I'd be happy to do so. But the time doesn't matter because they have the opportunity to make many, many, many times more widgets than we did. You would have to go back. And frankly, the practicality of what they're suggesting, that we go back and calculate royalty rates, because there is this sentence that says a reasonable rate is 2 to 5 cents. I want to go back to that a little bit. It relates to your argument, I think, or to your question, Judge Higginson. The 2 cents to 5 cents is framed as J.P. Morgan agrees that would be reasonable. And the argument Data Treasury makes about how that modified sentence won is that it cabins favorability in some way. But how? And they can't explain how. So, for example, if it turns out we did this complex calculation where we figured out, okay, what is the actual per transaction royalty J.P. Morgan paid based on its real use? And what is it that Cathay did? And by the way, we can't do that because we have lumps on licenses that relieved these parties of the duty to track and to keep any kind of records of use. So doing that would be almost impossible. But let's say we did. And let's say it turned out that J.P. Morgan Chase, its calculation came out to 5 cents per click. And Cathay's was 2 cents per click. 5 cents is still less favorable than 2 cents regardless of whether 2 to 5 cents is a reasonable range. There's no reference to favorability in that second sentence. It doesn't, there's no sensible application of that to modify a determination of whether it's more favorable to pay 70 million for unlimited use than to pay 250,000. Taken to another example, let's say J.P. Morgan Chase's rate under that calculation was 1 cent below this reasonable range. And Cathay's was half a cent. Again, the 2 to 5 cent range would simply have no application. The problem is that data treasury cannot connect that sentence about what is a reasonable range of rates to any sort of rational application of a determination of favorability. Two, if your time's running out, one, I'd love to hear your thoughts on Rothstein. And two, do you have a limiting principle so that your argument doesn't mean that if they negotiate a license with a month left in the patent for just a small amount that corresponds to the value of that license, it wouldn't suddenly mean we have to substitute that payment 10 years back for you and knock out a 70 million? Is the logic of your rule that that will always be true without protective language? It will be true unless the drafters draft to consider it. And it's frankly an obvious consideration in the patent context. You're always thinking about what is the expiration and what am I buying and for what term am I buying? So. But it means you get an exclusive license because they would never be able to sell the license to 70 million for a licensee that's only going to get a month to use it. So it basically means you've gotten an exclusive license. Except, well, a couple of things. Number one, and I don't want to run out of time. Go ahead to Rothstein. Well, I want to address a couple of things on that. First, it's not a fixed limit on the license. Recall that both licenses extend for improvements and extensions. So there's no actual time limit on the licenses. I know you can focus on the originating licenses, but both parties have a right to further licenses. So it is in fact a perpetual license. I'd like to get to Rothstein very quickly. I will say that Rothstein is a bit troubling in its casualness of the analysis of the language. Rothstein does acknowledge that this is not an obvious principle. And Rothstein acknowledges it is relying expressly on the language of the particular MFN. Now, do I agree with the reasoning Rothstein applies when it says, well, there's another provision that says automatic. And automatic is applied to improvements. And improvements can only be prospective. So we'll say automatic with respect to the MFN also is only prospective. In my personal opinion, that's not sound reasoning. Rothstein, though, is a running royalty, wasn't it? Rothstein is also a conversion case. I mean, it's easily distinguishable on that ground. But I think the analysis, and that's really what's lacking, frankly, in most of these cases, is a thoughtful analysis of why you don't go back to the originating payment and sort of recalculate the license. And I think if you did that analysis, you would come up with the difference between paying per unit and paying for unlimited use, which is why you don't see lump sum to lump sum cases, because the application is so obvious. If the court has no further questions, I'll rest on my brief. All right. Thank you very much. OK. Mr. Rupp, back to you. Thank you, Your Honor. To begin with, notably absent from the list of cases that counsel recited wherein there is particularly limiting language as to the MFL clause's application were the decision of the Fifth Circuit in Atlanta v. Rothstein, in which there is no limiting language, and the Epic Systems decision out of the Northern District of Dallas, which of course, though not controlling, certainly could be considered persuasive by this court in its careful treatment. Does the Wells Fargo license contain limiting language in this case, in the record? You heard her mention that your client put in no refund in the Wells Fargo license. The Wells Fargo license does not contain a most favored licensee provision. The no refund language that counsel referred to is in the context of an entirely different consideration in the Wells Fargo patent license agreement. In addition, Your Honor asked, how does the license agreement characterize consideration? And the only reference in the license agreement to consideration, I think what Your Honor was asking is, does it say lump sum, or does it say periodic royalty, is in section 3.1, where on payment it says, consideration paid by JPMC for this license is set forth in, and will be paid in accordance with the terms in the settlement and release agreements, wherein, if memory serves me, they are characterized as a fully paid up license. Why was the per transaction language in the most favored licensee clause was a question that the panel asked of opposing counsel, and I'd like to speak to that point. JPMC maintains that the second sentence of the MFL clause is not evidence that favorability was intended to be based on a comparative cost per transaction between itself and some later licensee, but JPMC cannot offer the court any persuasive explanation for why it was there. Two precepts of contract interpretation come to bear. One, that we attempt to give meaning to all the words in a contract, and two, that we assume that their placement in certain locations in a contract are purposeful and have meaning. Here, the inclusion of the per transaction metric in the MFL clause itself, as opposed to elsewhere in the license agreement, or far more logically still, if JPMC's theory were correct, altogether outside the four corners of the confidential license agreement. The theory that the second sentence of the MFL clause addressing the per transaction metric was simply a bargaining chip for DTC's potential future use with other licensees is belied by one of JPMC's other appellate points. In the red response brief at pages 11 to 12, JPMC points out stridently to the court that the terms of DTC's license agreements were confidential. They were secret. And indeed, section 5.1 of this very patent license agreement between DTC and JPMC precluded DTC from disclosing any of the terms of the agreement to third parties. I thought the district court was saying that in case there was a suit claiming that the consideration was inadequate was a reason for putting that in there. The district court addressed instead JPMC's argument that it was for the use with potential future licensees, Your Honor. Another reason why JPMC's theory is likely incorrect is that DTC did secure from JPMC potentially beneficial concessions outside of the confidential license agreements. Specifically, as part of the license agreement, JPMC agreed to file an open court not under seal, not in a confidential license agreement, an admission that it had willfully infringed the DTC patents and the patents were valid and enforceable. So we can tell from this fact that DTC plainly knew how to secure publicly usable concessions from JPMC. And planning a transaction valuation statement in the midst of a most favored licensee clause in a confidential license agreement pertaining only to JPMC's infringement doesn't fit that mold. Instead, inclusion of that per transaction metric in the MFL clause is more readily understood as a manifestation of the party's intent that price favorability between JPMC's price and that of some later licensee would or at least could be measured as stated in the MFL clause itself on a per transaction basis. The last point that I'd like to address, Your Honor, is the representation made by counsel that JPMC made no representation that the per transaction metric was in reference to its own infringement. That's simply incorrect. If we look at the language of that sentence, the language says JPMC agrees that 2 cents to 5 cents per transaction is a reasonable royalty under the license granted herein, specifically the JPMC license. Thank you, Your Honor. I thank both counsel for an excellent argument. We really enjoyed the argument.